UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x
                          :

ANNA VIRGONA,                         :

            Plaintiff,         :

                          :

-v.-                             :

                          :

TUFENKIAN IMPORT-EXPORT VENTURES,  :
INC. and JAMES TUFENKIAN,           :

                          :

           Defendants.      :

                          :
----------------------------------------------------------------x



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/23/08

05 Civ. 10856 (GEL)

**OPINION AND ORDER**

Robert J. Barsch, Esq., New York, NY, for plaintiff.

Jeffrey H. Miller, Esq., Miller Law Offices, PLLC,
New York, NY, for defendants.

GERARD E. LYNCH, District Judge:

      Plaintiff Anna Virgona brings this action against Tufenkian Import-Export Ventures, Inc.

("Ventures" or "the company") and James Tufenkian, its president, charging sex-based wage

discrimination in violation of the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), sex-based

employment discrimination in violation of the laws of the State of New York and the City of

New York, and unpaid wages. (Compl. ¶¶ 23-25, 30-33, 35-38, 40-44.) Defendants

counterclaim for damages arising from plaintiff's alleged destruction of company property and

falsification of payroll records. (Answer ¶¶ 58-59.) Defendants move for summary judgment

dismissing all of plaintiff's claims, and plaintiff cross-moves for partial summary judgment

granting her claim for unpaid wages and dismissing defendants' counterclaim. For the reasons

set forth below, defendants' motion will be granted as to plaintiff's EPA claim, and plaintiff's

motion will be denied. All remaining claims will be dismissed for lack of jurisdiction.

## BACKGROUND

The facts set forth below are either undisputed or construed in the light most favorable to the plaintiff.

### I. Anna Virgona

#### A. Educational and Professional Background

Plaintiff Anna Virgona has a professional background in accounting. Although she did not graduate from high school, she did receive her GED shortly after leaving school. (D. 56.1 Stmt. ¶ 1;[1] P. 56.1 Stmt. ¶ 1; Virgona Dep. 7-8.) After receiving her GED, plaintiff worked in the accounting department of a company called Tilden for approximately four to five years; as a bookkeeper and in various other capacities for an organization called National Gifts for approximately one and a half to two years; and for an accounting firm now known as Vinnie Esposito and Associates. (Virgona Dep. 12-16.) While working, plaintiff completed several courses at Queens College, including one computer programming course, at least one writing course, and between one and five accounting courses, although she neither graduated nor received any type of certification or accreditation from the school. (D. 56.1 Stmt. ¶ 1; P. 56.1 Stmt. ¶ 1; Virgona Dep. 8-12.)

#### B. Employment at Ventures

In 1998, plaintiff became aware of a job opening at Ventures. (Virgona Dep. 17-18.) After being hired as a full-time consultant, plaintiff, along with several others, took responsibility for organizing the company's books. (Id.) In October 1998, plaintiff became a

---

[1] All citations to defendants' 56.1 statement refer to the undisputed facts section of Defendants' Memorandum of Law in Support of Motion to Dismiss.

full-time employee when the company's CFO hired her as one of two staff accountants. (P. 56.1 Stmt. ¶ 17; D. 56.1 Stmt. ¶ 2; Virgona Dep. 18-19, 23-24.) In addition to the two staff accountants, the company's accounting department consisted of approximately five other employees, including one responsible for accounts receivable, one responsible for accounts payable and payroll, one responsible for billing, one responsible for inventory, and a chief financial officer. (Virgona Dep. 19-20.) From the time plaintiff joined the company, plaintiff had access to information regarding the salaries of all Ventures employees. (P. 56.1 Stmt. ¶ 18; D. 56.1 Stmt. ¶ 3; Virgona Dep. 22-23, 25.) However, at no time during her employment did she ever discuss with James Tufenkian or her immediate supervisor, Eric Jacobson, her concern that others were being paid more than she was. (Virgona Dep. 63-64.)

According to plaintiff's official job description, as a staff accountant, her primary function was "[t]o assist the senior accountant in the preparation of financial statements and related account analysis and bank reconciliations." (D. Mem. Ex. F.) Plaintiff was responsible for reconciling bank accounts, maintaining fixed asset schedules and related schedules of accumulated depreciation, conducting general ledger account analyses, assisting in the preparation of audit schedules, serving as primary backup for the preparation of employee payroll, and assisting in the monthly closing and preparation of financial statements and schedules. (Id.; see also Jacobson Dep. 12.) Plaintiff's official job description largely accords with her own description of her actual duties, although plaintiff asserts that she also prepared payroll, prepared for year-end closings, prepared financial statements and the weekly money

3

flow short reports, and handled royalty management and payment.[2]  (P. 56.1 Stmt. ¶¶ 17, 19.)

The record does not disclose plaintiff's salary at all times during her employment, but at the time

of her termination, plaintiff was earning approximately $58,100 per year. (Id. 131-132; cf. P.

56.1 Stmt. Ex. A.)

    As a staff accountant, plaintiff had minimal contact with James Tufenkian, the president

of the company. (D. 56.1 Stmt. ¶ 5; Virgona Dep. 27-28.) During the early years of her

employment, she was supervised by one Rosansky, the CFO, and then, in or about April 1999,

by Eric Jacobson, Rosansky's successor. (P. 56.1 Stmt. ¶ 17; Virgona Dep. 23-24, 27.) Initially,

plaintiff enjoyed a positive relationship with Jacobson. (Virgona Dep. 27.) However, in late

2001 and early 2002, plaintiff's relationship with Jacobson began to sour. (Id. 30, 36.) Around

that time, Jacobson reduced plaintiff's performance-based bonus (D. 56.1 Stmt. ¶ 6) in light of

her inability to anticipate his needs in the workplace. (Virgona Dep. 34-35.) Although plaintiff

was upset about this reduction, her response had nothing to do with the amount of others'

bonuses as compared to her own. (Id. 36-38.) In fact, at no time did plaintiff raise concerns

about her bonus with anyone in the accounting department other than Jacobson. (Id. 37, 40.)

Plaintiff's displeasure with Jacobson continued into the spring of 2002, when plaintiff

complained to him that her salary was insufficient given the additional duties that she was

required to assume following the advent of two new retail affiliates. (P. Aff. ¶ 3; P. 56.1 Stmt. ¶

---

[2] Defendants dispute plaintiff's assertion that she prepared monthly financial statements
and weekly money flow short reports, as well as her assertion that she handled royalty
management. (D. Suppl. 56.1 Stmt. ¶¶ 17, 19.) They further contend that any preparation for
month-end and year-end closings was done under the supervision of the CFO. (Id.) All citations
to defendants' supplemental 56.1 statement refer to Defendants' Amended Statement of Material
Facts in Dispute Pursuant to Local Rule 56.

4

18.) During that conversation, plaintiff also informed Jacobson of her desire for a promotion to controller, since, she claimed, she was already performing the duties of that position.[3] (Id.)

On November 15, 2002, plaintiff received a performance review from Jacobson. (Virgona Dep. 42-43; cf. D. 56.1 Stmt. ¶ 6.) In the review, Jacobson offered plaintiff a one percent raise and informed her of a series of additional duties he wanted her to undertake. (P. 56.1 Stmt. ¶ 22; D. 56.1 Stmt. ¶ 6; Virgona Dep. 43, 45; Jacobson Dep. 36.) According to plaintiff, many of these duties previously had been performed by Mohammed Elgayar, the company's controller, who had been fired earlier that year but permitted to remain at the company for some time following his termination.[4] (Virgona Dep. 45, 55, 78.) Moreover, the additional duties required plaintiff, a salaried employee, to work additional hours. (Id. 45.)

Upon learning of her raise, plaintiff asserts that she complained to Jacobson that he did not want to give her the raise or title that should accompany the increase in her duties.[5] (P. 56.1 Stmt. ¶ 22; Virgona Dep. 101.) Because she had been performing certain duties prior to her review on the promise that eventually she would receive a raise commensurate with these added duties, plaintiff's discovery that she would receive only a one percent raise led her to inform Jacobson that she would cease performing some of her additional duties until he made her a better offer. (P. 56.1 Stmt. ¶¶ 22, 24; D. 56.1 Stmt. ¶ 9; Virgona Dep. 46-47, 126-127; cf.

---

[3] Defendants dispute that any such conversations or complaints occurred. (D. Suppl. 56.1 Stmt. ¶ 18.)

[4] At her deposition, plaintiff testified that although she was given the option, upon her termination, of remaining at the company to train her successor, she was not given a similar opportunity to remain at the company until finding new employment. (Virgona Dep. 55-56.)

[5] Despite her complaints, plaintiff was not the only employee to receive a one percent raise. (Virgona Dep. 99-100.) Indeed, some employees received no raise at all. (Id. 100.)

5

Jacobson Dep. 29.)

For at least a week around the time of her November 2002 performance review, plaintiff began arriving at work ten minutes late each day.[6] (P. 56.1 Stmt. ¶ 23; D. 56.1 Stmt. ¶ 8; Virgona Dep. 41-42, 76.) According to plaintiff, this practice was intended to compensate for the fact that once a month, and without any additional pay, she had come in an hour early in order to close a work computer system. (Virgona Dep. 41-42; see also Jacobson Dep. 39.) Plaintiff did not receive permission to take these steps, but when confronted by Jacobson as to whether she was coming in late, she openly acknowledged that she was "taking back [her] time." (Virgona Dep. 42.)[7]

On or about December 31, 2002, Jacobson informed plaintiff that she was being fired because of her failure to perform her duties, particularly the added duties which plaintiff ceased performing in protest of her meager raise.[8] (Id. 28-29, 48-49.) Following her termination, plaintiff was offered two weeks' severance pay. (D. 56.1 Stmt. ¶ 14; P. 56.1 Stmt ¶ 14; Virgona Dep. 121-122.) However, she declined the severance pay on the grounds that other employees had been offered six weeks' severance pay. (Virgona Dep. 122.) In response to plaintiff's

---

[6] Defendants dispute plaintiff's position as to the duration of her tardiness, contending that she was habitually late throughout the length of her employment. (D. Suppl. 56.1 Stmt. ¶ 23.)

[7] Plaintiff's reasons for arriving late are unclear, as she also testified that she came in ten minutes late each day in order to express her anger at what she considered a low raise. (Virgona Dep. 45-46.) Additionally, there is documentary evidence that when plaintiff discussed her tardiness with Jacobson, she explained that elevator traffic slowed her down in the mornings and compelled her to leave at five minutes to five in the evenings. (Id. 124-125.)

[8] Although defendants maintain that plaintiff was terminated on December 30, 2002 (D. 56.1 Stmt. ¶ 10), the record is unclear on this issue. Viewing the facts in the light most favorable to plaintiff, plaintiff was terminated on December 31, 2002.

6

complaints about severance, Jacobson informed plaintiff that she would not receive six weeks' severance pay because her termination was based on a failure to perform and because plaintiff had destroyed certain files belonging to the company. (Id.; D. Mem. Ex. E.) In addition to not receiving severance pay, plaintiff also never received a paycheck for her last six days of work. (P. 56.1 Stmt. ¶ 29; Jacobson Dep. 42-43; D. Mem. Ex. E.) Defendants contend that this is because plaintiff deleted certain files from company computers and withheld various passwords, thus blocking defendants' access to other company computer files. (D. Mem. Ex. E; Jacobson Dep. 43.)

## II. Mohammed Elgayar

### A. Educational and Professional Background

Mohammed Elgayar, one of the two employees plaintiff argues performed work equal to hers, received a bachelor's degree in accounting from Alexandria University in Egypt and an MBA from Long Island University in Brooklyn, New York. (Virgona Dep. 132; D. Mem. Ex. G.) At the time of his employment with Ventures, Elgayar held a CPA license and had twelve years of accounting experience, including three years of experience as an assistant controller or controller and at least three years of management experience. (D. Mem. Ex. G.)

### B. Employment at Ventures

Elgayar began working at Ventures in mid-2000. (Jacobson Dep. 13.) As controller, he received an annual salary of approximately \$78,000. (Id. 13, 23.) According to plaintiff, although Elgayar held the title of controller and received superior pay, she performed essentially

the same duties as he did, and he had no duties above and beyond those that she performed.[9] (Virgona Dep. 58, 60-62; Jacobson Dep. 13.) Defendants dispute plaintiff's characterization of Elgayar's duties, asserting that, unlike plaintiff, Elgayar was responsible for preparing financial statements and presenting them, reporting month-end sales, reporting sales for purposes of calculating commissions, conducting bookings calculations, managing the database created by the accounting system SBT, and conducting various cost, margin, and other ad hoc analyses. (Jacobson Dep. 15-16.) Defendants add that plaintiff did not know how to perform many of the duties assigned to Elgayar, particularly those involving work with pivot tables. (Id. 16-17, 31; D. Mem. 10.)

In the spring of 2003, Elgayar left the company after Jacobson determined that Elgayar was not performing at the level desired and the company implemented an organizational restructuring that would vest Jacobson with more responsibility for the company's financial matters, obviating the need for Elgayar's position. (Virgona Dep. 62; Jacobson Dep. 14.) Plaintiff asserts that after Elgayar's termination, which occurred in or about January 2002, he was permitted to remain at the company until finding new employment.[10] (Virgona Dep. 55, 61, 78.)

_____

[9] According to plaintiff, her basis for knowing Elgayar's duties is that she was actually completing his work. (Virgona Dep. 60.) Plaintiff also testified, however, that Elgayar's duties were the same as those of Jacobson – the CFO, her direct supervisor, and someone whom she acknowledged did not perform work equal to hers. (Id. 62, 76.)

[10] Defendants, however, characterize Elgayar's departure from the company not as a firing, but as the consequence of an agreement that his position would not be continued beyond a particular date. (Jacobson Dep. 14-15.) Additionally, defendants maintain that Elgayar was permitted to remain at the company solely because the company needed someone to perform the duties that he had previously performed until it could fully transition to its new operating structure. (Id. 15.)

8

## III. Dan Stoian

The other employee whose work plaintiff regards as equal to hers was Dan Stoian. After plaintiff was fired and Elgayar left the company, Jacobson hired Stoian as assistant controller and plaintiff's successor. (P. 56.1 Stmt. ¶ 32; D. Suppl. 56.1 Stmt. ¶ 32; Jacobson Dep. 17-18.) According to defendants, although Jacobson assumed the majority of duties previously performed by Elgayar, some of Elgayar's duties – including non-check AP transactions, wire transfer transactions, payroll, and journal entries – were assumed by Stoian. (Jacobson Dep. 17-18.) In addition to the duties Stoian assumed from Elgayar, Stoian was also responsible for financial statement preparation and presentation, database management, and general management, all of which are duties defendants claim plaintiff was incapable of performing. (Id. 25.) Stoian received an annual salary of approximately $58,000. (Id. 18.)

## IV. The Parties' Contentions

Plaintiff argues that summary judgment is inappropriate because there are genuine issues of material fact as to whether she and Elgayar performed substantially equal work but received disparate pay, and whether Stoian, her male successor, received a higher job title. (P. Mem. 4.) Plaintiff also argues that she is entitled to summary judgment granting her claim for unpaid wages and dismissing defendants' counterclaim for damages resulting from her alleged destruction of company property and falsification of payroll records. (Id. 8-10.)

For their part, defendants argue that they are entitled to summary judgment on plaintiff's EPA claim because the claim is time-barred, because plaintiff has failed to raise an issue of fact as to whether she and Elgayar performed substantially equal work, because plaintiff's salary was equivalent that awarded to her male successor, and because any other pay disparity is justified by

9

a legitimate sex-neutral reason. (D. Mem. 1.) Defendants further contend that plaintiff's claims alleging sex-based employment discrimination under the laws of New York State and New York City fail for the same reasons as plaintiff's EPA claim. (Id. 14-15.) Finally, defendants claim that because plaintiff cannot demonstrate any basis for entitlement to severance pay, they should be granted summary judgment to the extent that plaintiff seeks to recover such pay under her unpaid wages claim. (Id. 16-17.)

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Second Circuit has made clear, "[i]t is . . . beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). On a motion for summary judgment, the movant bears the "burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle it to judgment as a matter of law." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). However, when moving against a party who will bear the ultimate burden of proof on an issue, "the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (noting that a "moving party is entitled to judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of her

10

case with respect to which she has the burden of proof") (internal quotation marks omitted).

Once the moving party has satisfied its burden, the burden then shifts to the nonmoving party to come forward with affidavits, depositions, interrogatories or other sworn evidence sufficient to create a genuine issue of material fact for trial. See Fed. R. Civ. P. 56(e)(2); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The nonmoving party may not satisfy this burden simply by "show[ing] that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586; see also Trans Sport, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992) (holding that a nonmovant cannot defeat a motion for summary judgment "merely . . . on the basis of conjecture or surmise"), quoting Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991) (internal quotation marks omitted). Rather, the nonmovant must advance "enough evidence to support a jury verdict in its favor." Trans Sport, Inc., 964 F.2d at 188.

In ruling on a motion for summary judgment, a court must construe all evidence in the light most favorable to the nonmoving party, including resolving all ambiguities and drawing all factual inferences in the nonmoving party's favor. Rule, 85 F.3d at 1011; Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994); Trans Sport, Inc., 964 F.2d at 188. A court must neither make judgments regarding credibility or conflicting versions of events, nor engage in any weighing of the evidence, as a court resolving a motion for summary judgment is tasked not with resolving disputed issues of fact, but instead with determining whether any genuine issues of material fact remain to be tried. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Rule, 85 F.3d at 1011. For purposes of making this determination, an issue is material if it "might affect the outcome of the suit under the governing law." Shade v. Hous.

11

Auth. of City of New Haven, 251 F.3d 307, 314 (2d Cir. 2001), quoting Anderson, 477 U.S. at 248 (internal quotation marks omitted).

## II. Equal Pay Act

### A. Legal Standards

The Equal Pay Act ("EPA"), passed by Congress in 1963, precludes an employer from discriminating against its employees by paying different wages to males and females who perform "equal work." 29 U.S.C. § 206(d)(1). "To prove a violation of the EPA, a plaintiff must first establish a *prima facie* case of discrimination by showing: 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.'" Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999), quoting Tomka v. Seiler Corp., 66 F.3d 1295, 1310 (2d Cir. 1995); see also Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974). At no time, however, is a plaintiff required to "prove that the pay disparity was motivated by an intention to discriminate on the basis of gender." Pollis v. New Sch. for Social Research, 132 F.3d 115, 118 (2d Cir. 1997).

Once a plaintiff has established a *prima facie* case of discrimination under the EPA, the burden then shifts to the defendant to demonstrate that the pay disparity is justified by "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1); see also Corning Glass Works, 417 U.S. at 196; Belfi, 191 F.3d at 136. These justifications reflect the EPA's acknowledgment that "an employer may pay different salaries to its employees for a variety of different legitimate reasons." Engelmann v. Nat'l Broadcasting

12

Co., Inc., No. 94 Civ. 5616, 1996 WL 76107, at * 10 (S.D.N.Y. Feb. 22, 1996). Once established, each justification provides "a complete defense to conduct that would otherwise violate the statute." Mazzella v. RCA Global Commc'ns, Inc., 642 F. Supp. 1531, 1551 (S.D.N.Y. 1986).

Assuming an employer advances proof that a pay disparity is justified, the plaintiff may then counter the employer's defense by coming forward with evidence showing that the proffered justification is a pretext for sex discrimination. See Belfi, 191 F.3d at 136. In assessing whether a plaintiff has demonstrated pretext, "[t]he appropriate inquiry . . . is whether the employer has 'use[d] the factor reasonably in light of the employer's stated purpose as well as its other practices.'" Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 526 (2d Cir. 1992) (second alteration in original), quoting Maxwell v. City of Tucson, 803 F.2d 444, 446 (9th Cir. 1986).

B.    Statute of Limitations

Defendants first argue that plaintiff's EPA claim should be dismissed as time-barred given her failure to commence the action within the two-year limitations period set forth in 20 U.S.C. § 255(a). (See D. Mem. 1.) Plaintiff, however, asserts that there is a genuine issue of material fact as to whether defendants' actions were willful and therefore permit application of a longer limitations period.[11] (See P. Mem. 3.)

Under 29 U.S.C. § 255(a), an EPA claim "must be commenced within two years of its accrual, or three years if the violation is willful." Pollis, 132 F.3d at 118. For purposes of the

---

[11] Although the record contains references to an earlier action brought by plaintiff arising from the facts at issue in this case (see, e.g., Virgona Dep. 88-90), plaintiff has not argued that any such action operated to toll the statute of limitations.

13

statute of limitations inquiry, "[a] new claim accrues each time an employee receives a paycheck under a discriminatory wage policy, but the policy's existence does not make the violation a 'continuing' one, such that the plaintiff can seek backpay beyond the statutory period of two or three years." Downes v. JP Morgan Chase & Co., No. 03 Civ. 8991, 2004 WL 1277991, at * 7 (S.D.N.Y. June 8, 2004), citing Pollis, 132 F.3d at 118-19.

Here, plaintiff was terminated on December 31, 2002, and commenced this action on December 29, 2005. Under a two-year statute of limitations, plaintiff's action is clearly time-barred. However, assuming application of a three-year statute of limitations, plaintiff's action would be timely.[12] Resolution of defendants' argument that they are entitled to summary judgment because the action is untimely thus turns on the willfulness or non-willfulness of any EPA violation.

In determining whether an employer's EPA violation is willful, a court must ask whether "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); see also Pollis, 132 F.3d at 119. For purposes of this inquiry, an employer acts willfully where "the proof shows that an employer was indifferent to the requirements of the governing statute and acted in a purposeful, deliberate, or calculated fashion." Benjamin v. United Merchants & Mfrs., Inc., 873 F.2d 41, 44 (2d Cir. 1989).[13] Indifference, in turn, exists where an employer "acts

---

[12] Even if plaintiff received the benefit of the three-year statute of limitations applied to willful EPA violations, her recovery would be limited to damages for the period between December 29, 2002 and December 31, 2002. See Downes, 2004 WL 1277991, at * 7.

[13] Benjamin v. United Merchants & Mfrs., Inc., 873 F.2d 41 (2d Cir. 1989), construes the term "willful" as it is used in the context of the liquidated damages provision of the ADEA, 29 U.S.C. § 626(b). See id. at 43-44. However, the McLaughlin Court ultimately adopted the

14

without interest or concern for its employees' rights under the [governing statute] at the time it decides to [take the action complained of]; that is, without making any reasonable effort to determine whether the decision to [take the action complained of] violates the law." Id.; see also LeGoff v. Trustees of Boston Univ., 23 F. Supp. 2d 120, 125 (D. Mass. 1998) (noting that for purposes of willful EPA violations, "[r]ecklessness involves more than mere awareness of the existence of a governing federal law, or negligence in complying with it, yet less than 'voluntary,' 'deliberate,' or 'intentional' conduct. 'Deliberate indifference' to the requirements of the law, requirements that the employer 'should have known' about, may be willful, while 'good faith but incorrect conduct' is not.") (citation omitted), quoting Andover Newton Theological Sch., Inc. v. Continental Cas. Co., 930 F.2d 89, 91 (1st Cir. 1991) (interpreting McLaughlin) and Sanchez v. Puerto Rico Oil Co., 37 F.3d 712, 721-22 (1st Cir. 1994).

Plaintiff concedes that although she had access to payroll and was therefore fully aware of her colleagues' salaries (see P. Stmt. 56.1 ¶ 18; D. 56.1 Stmt. ¶ 3; Virgona Dep. 22-23, 25), at no time during her tenure at Ventures did she actually complain that her salary was *unequal* to that of other employees performing equal work. (See Virgona Dep. 63-64.) Contrary to defendants' position, however, this concession does not – as a matter of law – subject plaintiff's claim to the two-year statute of limitations governing non-willful EPA violations. Plaintiff's failure to complain of any inequity in pay may very well foreclose a reasonable jury from finding willfulness on the basis of defendants' actual knowledge of an EPA violation and subsequent

definition of "willful" outlined in Trans World Airlines, Inc. v. Thurston, 469 U.S. 111 (1985), the Supreme Court case which sets forth the controlling definition of willfulness in the ADEA context. See id. at 128. Because the definition of "willful" in the EPA context is the same as the definition of "willful" in the ADEA context, the Second Circuit's reasoning in Benjamin is persuasive.

15

failure to remedy such violation. However, "actual knowledge is not the only means of proving willfulness." Cross v. New York City Transit Auth., 417 F.3d 241, 252 (2d Cir. 2005).[14] "[W]illfulness . . . can be established either by proof that a defendant actually knew that his conduct violated federal law *or* by reckless disregard of that fact." Id.

Plaintiff asserts, while defendants deny, that in the spring of 2002, she informed Jacobson that her pay was insufficient in light of the additional duties related to two new retail affiliates that she had been performing on the promise of increased future pay, and which she was being asked to continue performing. (See P. Aff. ¶ 3; P. 56.1 Stmt. ¶ 18; D. Suppl. 56.1 Stmt. ¶ 18.) Plaintiff also claims – and defendants further deny – that she told Jacobson that she wanted a promotion to the position of controller since she was already performing the duties associated with that position. (Id.) In light of this issue of fact, defendants have not shown that (assuming arguendo that any violation at all could be found) a reasonable jury would be unable to find willfulness on the basis of defendants' "reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin, 486 U.S. at 133. As held by other courts, granting summary judgment on statute of limitations grounds is inappropriate where there is an issue of fact as to whether defendant, although not directly informed of inequity in pay by the plaintiff, had access to payroll records demonstrating "pay disparities between male and female employees in seemingly similar positions" or was aware that plaintiff "was performing work 'above and beyond' that of [her title] while not offering a salary [commensurate] with that performance." See e.g., Glunt v. GES Exposition Servs., Inc., 123 F. Supp. 2d 847, 861 (D. Md.

---

[14] Cross v. New York City Transit Authority, 417 F.3d 241, 252 (2d Cir. 2005), is persuasive for the reasons cited in note 12 above.

2000). Accordingly, defendants' motion for summary judgment is denied with respect to their statute of limitations defense.[15]

## C. Substantially Equal Work

When attempting to satisfy the EPA's requirement of equal work, "'[a] plaintiff need not demonstrate that her job is identical to a higher paid position, but only . . . that the two positions are 'substantially equal'' in skill, effort, and responsibility." Lavin-McEleney v. Marist College, 239 F.3d 476, 480 (2d Cir. 2001) (alteration in original), quoting Tomka, 66 F.3d at 1310; see also Borrero v. Am. Exp. Bank Ltd., 533 F. Supp. 2d 429, 439 (S.D.N.Y. 2008). Notwithstanding this rule, the threshold for proving that two jobs are equal is high. See Guglielmo v. Marchon Eyewear, Inc., No. 02 Civ. 5434, 2006 WL 398617, at * 7 (E.D.N.Y. Feb. 16, 2006). Indeed, "where jobs are merely comparable, an action under the Equal Pay Act will not lie." Lambert v. Genesee Hosp., 10 F.3d 46, 56 (2d Cir. 1993); see also Sobol v. Kidder, Peabody & Co., Inc., 49 F. Supp. 2d 208, 219 (S.D.N.Y. 1999).

### 1. Mohammed Elgayar

In her attempt to demonstrate a prima facie case of sex-based wage discrimination under the EPA, plaintiff first argues that she was denied the title and pay given to Mohammed Elgayar, the company's controller and, according to plaintiff, an employee whose duties she performed prior to, during, and following his employment with the company. (See P. Mem. 4.)

---

[15] As discussed below, plaintiff has failed to present evidence sufficient to raise a jury question with respect to the merits of her claim under the EPA. Since no reasonable factfinder could conclude that there was any violation at all, it follows that no such factfinder could find a *willful* violation. Nevertheless, if the evidence presented by plaintiff did warrant trial on the merits, defendants' knowledge of the basic facts regarding plaintiff's and Elgayar's duties would permit a finding that any violation that did occur was willful. Thus, the statute of limitations does not provide an independent basis for dismissal.

17

Defendants, in turn, argue that plaintiff has not presented an issue of fact regarding the substantial equality of the two employees' work, as plaintiff and Elgayar did not perform the same duties, nor was plaintiff capable of performing Elgayar's duties. (See D. Mem. 8-11.)

The record evidence specifically identifying the duties performed by plaintiff and by Elgayar is scant, to say the least. Plaintiff gave general testimony that she performed essentially the same duties as Elgayar. (See Virgona Dep. 58, 60-62.) Defendants, however, argue that Elgayar performed a number of duties that plaintiff did not, including preparing and presenting financial statements, reporting month-end sales, reporting sales for purposes of calculating commissions, conducting bookings calculations, managing the database created by the accounting system SBT, and conducting various cost, margin, and other ad hoc analyses. (See Jacobson Dep. 15-16.) Additionally, defendants assert that plaintiff was incapable of performing many of these duties, particularly those involving work with pivot tables.[16] (See id. 16-17, 31; D. Mem. 10.) Finally, defendants stress that plaintiff implicitly acknowledged that she and Elgayar did not perform equal work by arguing, inconsistently with her claim, that controller was a higher position to which she should have been promoted. (See D. Mem. 9.)

In light of the conflicting, albeit thin, evidence advanced by the parties, determining whether plaintiff and Elgayar performed substantially equal work would necessarily entail credibility determinations. As this Court's task on summary judgment is not to resolve any

---

[16] Although plaintiff acknowledges that she does not possess Elgayar's educational qualifications (see P. Mem. 5), and that no one worked with pivot tables prior to Elgayar's employment with Ventures (see Virgona Dep. 80), she contends that she learned how to perform Elgayar's duties through her length of service with the company and the opportunity that her position gave her to observe the controller and the controller's duties and job functions. (See P. Mem. 5.)

18

disputed issues of fact but instead to determine whether any such issues remain to be tried, the Court cannot conclude that – as a matter of law – plaintiff cannot establish a *prima facie* case under the EPA. Thus, for purposes of this motion, and to the extent that plaintiff's EPA claim rests on the substantially equal work she alleges she and Elgayar performed, the Court assumes that plaintiff has met her initial burden.

### 2. Dan Stoian

In addition to her allegations of pay disparity, plaintiff also argues that defendants violated the EPA when they failed to give her the higher job title of assistant controller ultimately awarded to her successor, Dan Stoian. This claim is meritless. The EPA proscribes wage disparities, not disparities in job title. Thus, where a plaintiff complains of activity that "does not involve disparate pay between any two employees," the EPA affords no remedy. Milligan v. Citibank, N.A., No. 00 Civ. 2793, 2001 WL 1135943, at * 8 (S.D.N.Y. Sept. 26, 2001). Because plaintiff concedes, and the evidence shows, that her salary was "essentially the same" as Stoian's (see Virgona Dep. 132; see also Jacobson Dep. 18; cf. P. Mem. 4), plaintiff has raised no issue of disparate pay as compared to Stoian. Accordingly, defendants' motion for summary judgment is granted to the extent plaintiff's EPA claim relies upon the disparity in job title between her and her successor.

### D. Explanatory Factors Other than Sex

Even assuming, arguendo, that she has presented a prima facie case of pay disparity under the EPA, plaintiff fails to counter defendants' affirmative defense that the pay disparity is justified by a factor other than sex. Accordingly, defendants are entitled to summary judgment on this ground.

An employer seeking to rely on the "factor other than sex defense[] . . . must . . . demonstrate that it had a legitimate business reason for implementing the gender-neutral factor that brought about the wage differential." Belfi, 191 F.3d at 136; see also Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 526 (2d Cir. 1992). "This limitation prevents the employer from relying on a compensation differential that is merely a pretext for sex discrimination – *e.g.,* determining salaries on the basis of an employee's height or weight, when those factors have no relevance to the job at issue." Engelmann v. Nat'l Broadcasting Co., Inc., No. 94 Civ. 5616, 1996 WL 76107, at * 7 (S.D.N.Y. Feb. 22, 1996).

It is well-established that an employer satisfies this standard where it determines to pay employees with greater experience more than their counterparts who lack such experience. See, e.g., Miller v. Batesville Casket Co., No. 02 Civ. 5612, 2007 WL 2120371, at * 13 (E.D.N.Y. July 23, 2007); Costanzo v. U.S. Postal Service, No. 00 Civ. 5044, 2003 WL 1701998, at * 8, 12 (S.D.N.Y. Mar. 31, 2003); Ottaviani v. State Univ. of N.Y., 679 F. Supp. 288, 338 (S.D.N.Y. 1988); see also Stanley v. Univ. of So. Cal., 13 F.3d 1313, 1322 (9th Cir. 1994). This rule stems largely from the rationale that "[a]n employee's past experience in a position makes him better able to do it in the future, and understandably justifies a higher salary than might be paid to a newcomer." Engelmann, 1996 WL 76107, at * 10. Similarly, "[a]lthough the EPA does not explicitly address the issue of professional credentials, courts have recognized that employees with higher professional credentials or educational degrees may be more generously compensated." Delgado v. Puerto Rican Family Institute, Inc., No. 97 Civ. 7122, 2001 WL 964000, at * 3 n.3 (S.D.N.Y. Aug. 23, 2001); Ottaviani, 679 F. Supp. at 338; see also Stanley, 13 F.3d at 1322.

20

Here, defendants claim that any pay disparity is justified by plaintiff's and Elgayar's differing qualifications. (See D. Mem. 1, 12.) Consistent with defendants' position, not only did Elgayar hold a bachelor's degree in accounting, an MBA, and a CPA license, but he also possessed twelve years of experience in the field, including three years of experience as an assistant controller or controller and at least three years of management experience. (See Virgona Dep. 132; D. Mem. Ex. G.) Plaintiff's qualifications are no match for those of Elgayar. Although plaintiff holds a GED and has completed a handful of college courses, she never received a college degree, much less an MBA. (See Virgona Dep. 132-133.) Moreover, while plaintiff possessed approximately seven to ten years of experience in the field at the time of hire, she had never worked as an assistant controller or as a controller. (See id. 115.) That the disparity between Elgayar and plaintiff was based on a factor other than sex is further supported by the fact that plaintiff's male replacement, whose credentials were superior to plaintiff's, received a salary commensurate with plaintiff's rather than Elgayar's. (See D. Suppl. 56.1 Stmt. ¶ 32; Virgona Dep. 132; see also Jacobson Dep. 18; cf. P. Mem. 4.) Given these facts, defendants have carried their burden of proving a legitimate, sex-neutral justification for the disparity between plaintiff's and Elgayar's pay.[17]

Plaintiff offers no response to defendants' proffered justification. "A wage discrimination plaintiff, like any other, may not rest on conclusory allegations of discrimination

---

[17] That Elgayar proved incompetent in the position and had to be fired (as a reasonable factfinder could, but would not have to, find) does not change this result. Defendants were entitled to hire an apparently more qualified person at a higher salary. That the experiment failed to work out may show that educational credentials are not always a good indicator of professional worth, but that does not mean that the employer acted unlawfully in relying on them to set salaries.

to defeat an employer's legitimate explanation for its conduct. Rather, the plaintiff must offer specific facts to create an issue of fact as to whether the employer's proffered justifications are true or false." Engelmann, 1996 WL 76107, at * 11. Where a plaintiff fails to advance any evidence suggesting that a defendant's other than sex defense is a pretext, summary judgment is appropriate. See Milligan, 2001 WL 1135943, at * 9; Delgado, 2001 WL 964000, at * 4; Wolper v. McGraw-Hill, Inc., No. 94 Civ. 0976, 1997 WL 252032, at * 7-8 (S.D.N.Y. May 13, 1997); Engelmann, 1996 WL 76107, at * 11; see also Stanley v. Univ. of So. Cal., 178 F.3d 1069, 1075-77 (9th Cir. 1999). Thus, because defendants have demonstrated a legitimate justification for the pay disparity at issue and plaintiff has failed to raise an issue of fact regarding the validity of that justification, defendants' motion for summary judgment is granted as to plaintiff's EPA claim.

## III. State Law Claims

Plaintiff asserts a number of other claims under New York State and New York City law, including two claims alleging sex-based employment discrimination and one claim for unpaid wages. In addition, defendants counterclaim for damages related to plaintiff's alleged destruction of company property and falsification of payroll records. Pursuant to 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over state law claims that are so related to a party's federal claims that "they form part of the same case or controversy." 28 U.S.C. § 1367(a). In general, however, "where the federal claims are dismissed before trial, the state claims should be dismissed as well." Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998); cf. 28 U.S.C. § 1367(c)(3). Because defendants are entitled to summary judgment on plaintiff's only federal claim, the Court declines to exercise supplemental jurisdiction over the remaining state law claims. Plaintiff's state law claims and defendants' counterclaim are therefore

22

dismissed, without prejudice to their resolution by a state tribunal.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied, and

defendants' motion for summary judgment is granted as to plaintiff's claim under the Equal Pay

Act. All remaining state law claims are dismissed without prejudice.

SO ORDERED.

Dated: New York, New York
September 23, 2008

GERARD E. LYNCH
United States District Judge